**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert S. TREFF, Defendant–Appellant.**

**No. 89–4126.**

United States Court of Appeals,
Tenth Circuit.

Jan. 29, 1991.

Glen R. Dawson, Asst. U.S. Atty. (Dee Benson, U.S. Atty., and Richard N.W. Lambert, Asst. U.S. Atty., with him on the brief), Salt Lake City, Utah, for plaintiff-appellee.

Mark D. Eibert, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with him on the brief), Denver, Colo., for defendant-appellant.

Before McKAY, SEYMOUR, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

In a four-count indictment Robert S. Treff was charged as follows: In Count I he was charged with an attempt to kill Carol M. Fay, an employee of the Internal Revenue Service, on account of her performance of her official duties, in violation of 18 U.S.C. § 1114; in Count II Treff was charged with assault and intimidation of Carol M. Fay, a District Director of the Internal Revenue Service, a person designated in 18 U.S.C. § 1114, on account of her performance of her official duties, and in the commission of such act used a deadly weapon, namely an incendiary device commonly known as a "Molotov cocktail," in violation of 18 U.S.C. § 111; in Count III Treff was charged with using a "Molotov cocktail" during a crime of violence, to wit, assaulting, intimidating and attempting to kill Carol Fay, in violation of 18 U.S.C. § 924(c)(1); and in Count IV he was charged with possessing a "Molotov cocktail" which was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). A jury convicted Treff on all four counts.[1]

---

1. There was considerable delay in getting this case to trial. Part of the delay was caused by a psychiatric evaluation and competency hearing, after which the district court found Treff incompetent to stand trial and committed him to four months of psychiatric treatment. Following

Treff was sentenced as follows: On Count I Treff was sentenced to fifteen years imprisonment; on Counts II and IV he was sentenced to five years imprisonment on each count to run concurrently with each other but consecutively to the term of imprisonment imposed on Count I; and on Count III Treff was sentenced to five years imprisonment to run consecutively to the sentences imposed on Counts I, II, and IV. The foregoing 25–year total federal sentences were ordered to commence upon completion of a 20–year state manslaughter sentence Treff was then serving which was previously imposed by a state court in Utah. Treff now appeals the federal convictions.

At trial, defense counsel conducted very limited cross-examination of the government's witnesses. He did not call any defense witnesses, and Treff himself did not testify. Such is mentioned at this point to show that all of the evidence at trial was presented by the government. A detailed statement of the government's evidence is not necessary. Suffice it to say that Robert Treff (Treff), his wife Jennifer, and Carol Fay all worked in the Salt Lake City office of the Internal Revenue Service. Treff was employed as a tax examiner from January 7, 1982 until October 1, 1985, when he quit. Fay was Treff's supervisor. Treff was passed over for several promotions and he blamed Fay for his failure to be promoted. At the same time, Treff was having domestic problems.

The government's evidence showed that on December 25, 1986 at about 9:00 p.m. Treff shot and killed his wife at their home in Orem, Utah.[2] This was about a year after both parties had filed for divorce and at a time when the two were in a bitter child custody dispute. After the shooting, Treff took his two children to a motel in Midvale, Utah. He then drove approximately fifteen miles to Carol Fay's home in Salt Lake City, Utah, where he threw two "Molotov cocktails" on the roof of Fay's residence.[3]

On appeal, Treff raises five issues: (1) that the district court erred in denying Treff his constitutional and statutory right to represent himself at trial; (2) that Treff did not receive effective assistance of counsel; (3) that the district court erred in admitting evidence that shortly before Fay's house was fire-bombed Treff had killed his wife; (4) that the district court erred in admitting evidence of a diary entry by Mrs. Treff that Treff had said that he wanted to kill Fay; and (5) that the evidence is insufficient to support the convictions on Counts I and II.

## I. Treff's Right to Self–Representation

Treff first argues that he was denied his right to represent himself at trial. In this regard, all agree that a defendant in a criminal proceeding has a constitutional and statutory right to represent himself. *See Faretta v. California,* 422 U.S. 806, 814, 819–20, 95 S.Ct. 2525, 2530, 2533–34, 45 L.Ed.2d 562 (1975).[4] However, the waiver by a defendant of his right to counsel in a criminal proceeding must be "intelligent and knowing" and "made with his eyes open." *United States v. Dinneen,* 463 F.2d 1036, 1040 (10th Cir.1972). A defendant's waiver of his right to representation and his concomitant election to represent himself must be "clearly and unequivocally" asserted. *United States v. Bennett,* 539 F.2d 45, 50 (10th Cir.), *cert.*

treatment, the district court, after hearing, found Treff competent to stand trial. Other delays were occasioned by the fact that Treff fired his first two court-appointed attorneys, and two district court judges recused themselves.

2. Treff was charged with the murder of his wife in a state court of Utah. As the result of a plea bargain, Treff pleaded guilty to voluntary manslaughter and was sentenced to 20 years imprisonment in the state's penitentiary.

3. In this case, the "Molotov cocktail" consisted of a Slice pop bottle filled with gasoline and a terry cloth wick. The wick was lit and the bottle was thrown onto the roof of Fay's residence. The bottle exploded and a fire ensued. No serious damage was done to Fay's residence, although there were burn marks on both the roof of the house and a nearby fence.

4. The right to self-representation is based on the Sixth Amendment, 28 U.S.C. § 1654 and Fed.R. Crim.P. 44(a).

*denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976). The reason that a defendant must make an "unequivocal" demand for self-representation is that otherwise "convicted criminals would be given a ready tool with which to upset adverse verdicts after trials at which they had been represented by counsel." *Meeks v. Craven,* 482 F.2d 465, 467 (9th Cir.1973), cited with approval by this court in *United States v. Bennett,* at 51.

It follows that if a defendant in a criminal proceeding makes an *equivocal* demand on the question of self-representation, he has a potential ground for appellate reversal no matter how the district court rules. If the district court denies defendant's equivocal demand to represent himself, the defendant, on appeal, will argue that his constitutional right to self-representation has been denied. And if the district court grants defendant's demand for self-representation, the defendant, on appeal, will argue that his waiver of his right to counsel was not intelligent, knowing and unequivocal. All of which is a form of the "cat and mouse" game mentioned in *United States v. Padilla,* 819 F.2d 952, 959 (10th Cir.1987) and in *United States v. Gipson,* 693 F.2d 109, 112 (10th Cir.1982), *cert. denied,* 459 U.S. 1216, 103 S.Ct. 1218, 75 L.Ed.2d 455 (1983).

■ As indicated, counsel are in substantial agreement as to what the law is on this matter, but they disagree as to the application of the law to the chronology of events leading up to trial. After the return of the indictment, the district court appointed counsel to represent Treff. The latter became dissatisfied with his appointed counsel, and the district court then appointed different counsel to represent Treff. Treff was not satisfied with the newly appointed counsel, and it would appear that at this juncture the district court was going to allow Treff to represent himself with appointed counsel serving in a "standby" capacity. Then there was a change in events. Treff's parents retained new counsel, a Mr. Bennett, who entered a general appearance for Treff, and indicated to the court that he would be prepared to try the case on the date scheduled. Appointed counsel was then allowed to withdraw. Our study of the record indicates that after Mr. Bennett's entry of appearance there was not any clear and unequivocal, intelligent and knowing, waiver by Treff of his right to counsel and the exercise of his concomitant right to self-representation.[5] We find no error when at the commencement of trial the district court ruled that Treff could not cross-examine the government's witnesses.[6] Indeed, it is a bit surprising that the district court allowed Treff to make an opening statement to the jury, which opening statement was eventually cut short when Treff accused the judge of being biased.

## II. Ineffective Assistance of Counsel

■ As indicated, Treff's initial position is that he was denied his right to self-representation, and that he did not want to be represented by Mr. Bennett, but merely retained him as standby counsel. He then argues that Mr. Bennett's representation of him was constitutionally inadequate. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) there is a two-part test for determining whether a defense attorney's performance was so deficient that it violates the defendant's right to effective assistance of counsel. First, the defendant must show that his counsel's performance "fell below an

---

5. "Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79 L.Ed.2d 122 (1984).

6. It should be noted that a defendant has no right to hybrid representation and a request to proceed in such a manner is not deemed an election to proceed *pro se. Bennett,* 539 F.2d at 49; *United States v. Hill,* 526 F.2d 1019, 1024–25 (10th Cir.1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976). The decision to allow hybrid representation and to limit the defendant's participation in such representation is within the discretion of the trial court. *Bennett* at 49; *Hill* at 1021–25.

objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Second, he must also show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068; *acc'd Hopkinson v. Shillinger,* 866 F.2d 1185, 1204–05 (10th Cir.1989).

There is no disagreement as to the law on this particular matter, but counsel take a different view of the facts and what those facts tend to establish. Mr. Bennett was retained by Treff's parents to represent Treff at trial. Mr. Bennett immediately moved for a continuance of the trial which was about three weeks off. The motion was denied. When the matter came to trial, Mr. Bennett again moved for a continuance, which motion was also denied. The district judge conducted the *voir dire* of the jury panel. Mr. Bennett, after conferring with Treff, exercised all his challenges to individual members of the *voir dire.*

It is true that Bennett's cross-examination of government witnesses was limited, if not nonexistent. In this regard, Bennett advised the district court, in the presence of the jury, that it was the desire of Treff that defense counsel not cross-examine any government witness or call any defense witnesses. The alleged omissions by defense counsel were based on direct instructions from the defendant and were part of the defendant's trial strategy. Bennett did, however, participate in certain proceedings outside the presence of the jury, where Treff himself testified. Treff was allowed to make the opening statement to the jury, at which time Treff stated that he was making the opening statement because he knew more about the case than Bennett. Bennett, however, made the closing statement to the jury.

In determining whether Bennett's performance "fell below an objective standard of reasonableness," all the facts and circumstances must be taken into consideration. One such consideration is the fact that Treff forbade Bennett from cross-examining government witnesses and from calling any defense witnesses. We have not been advised as to just whom Treff would have liked to call as a defense witness. And for all we know, if Treff should get a new trial, he might not call any witnesses at the retrial.[7]

■ In addition, appellate counsel has not pointed out any "prejudice" resulting to Treff as a result of Bennett's representation. As will be explored in Section V of this opinion, evidence that Treff fire-bombed Fay's home is very convincing. Although no one saw Treff throw the fire-bomb and he never confessed such, the circumstantial evidence that he was the person who threw the fire bombs is overwhelming. It is very doubtful that cross-examination of government witnesses would have shaken the government's case.[8] And, as indicated, we had not been advised as to possible defense witnesses who could have weakened the government's case.

Under all the circumstances, Bennett acted reasonably and we perceive no resulting prejudice.

### III. Admission of Other Crime Evidence

■ As mentioned above, at about 9:00 p.m. on December 25, 1986, Treff shot his wife four times, killing her instantly. Three spent shell casings were found at the scene of the homicide. Afterwards, Treff took his children to a motel and left them there for the evening. Treff then left the motel.

At about 11:25 p.m. on December 25, 1986, someone fire-bombed Carol Fay's home in Salt Lake City, Utah, with a Molotov cocktail. At 12:15 a.m. a second Molo-

---

**7.** Our study of the record leads us to conclude that Treff was not so much interested in defending against the crimes charged as he was in trying to inject trial error into the proceedings which could result in reversal on appeal.

**8.** The performance of defense counsel must be considered in light of the strength of the government's case. *United States v. Rivera,* 900 F.2d 1462, 1474 (10th Cir.1990); *United States v. Owens,* 882 F.2d 1493, 1502 (10th Cir.1989).

tov cocktail was thrown onto the Fay residence. Although neighbors who had been aroused were unable to identify Treff as the person who fire-bombed the Fay home, they did testify that the perpetrator was a "big" man and described the clothes he was wearing and the automobile in which he drove from the scene. Treff, incidentally, is 6'3" in height and weighs around 260 pounds. Furthermore, Treff owned a car and jacket similar to those seen by witnesses on the night of the fire-bombing.

Found at the scene of the fire-bombing was the fourth spent shell casing fired from the weapon which Treff used to kill his wife. Treff was arrested on December 26, 1986, and a search of his car disclosed a 9mm handgun which, according to expert testimony, was used to kill Mrs. Treff and which also fired the bullet from the shell casing which was later found outside Fay's home. Also found in Treff's automobile were some live 9mm shells, some terry cloth material similar to the Molotov cocktail wicks, and some rubber gloves. The terry cloth and the gloves had gasoline on them.

The district court admitted, over objection, evidence that Treff had killed his wife. At trial, although still standing on the prior objection, counsel stipulated that Treff killed his wife on December 25, 1986, at 9:00 p.m. Accordingly, no witness testified to the details of the killing. On appeal, Treff argues that it was reversible error to admit evidence that he killed his wife and that such admission contravened Fed.R. Evid. 404(b).

Rule 404(b) reads as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The government argues that evidence of Treff's killing of his wife does not come within the ambit of Rule 404(b), and alternatively, that such evidence was not offered to prove that his fire-bombing of the Fay residence was in conformity with the killing of his wife, but was offered to show that Treff was the person who threw the fire bombs, and to prove his intent, motive and preparation or plan.

*United States v. Record,* 873 F.2d 1363, 1372 n. 5 (10th Cir.1989) recognizes that Rule 404(b) applies only to evidence of other acts extrinsic to the crime charged. In this regard, *see also United States v. Orr,* 864 F.2d 1505, 1510 (10th Cir.1988). In *Record* we also cited with approval *United States v. Richardson,* 764 F.2d 1514, 1521–22 (11th Cir.), *cert. denied,* 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 303 (1985) where the Eleventh Circuit held that Rule 404(b) does not apply to other acts which are so "inextricably intertwined" with the crime charged that testimony concerning the charged act "would have been confusing and incomplete without mention of the prior act."

We think that it is a close question as to whether the act of killing Mrs. Treff was extrinsic to the fire-bombing of Fay's home. Mrs. Treff was killed at 9:00 p.m. on December 25, 1986, in her home in Orem, Utah. Treff then took his children and placed them in a motel in Midvale and proceeded on some fifteen miles to Fay's residence in Salt Lake City, Utah, where at 11:15 p.m. he threw a Molotov cocktail onto the roof of her house. That it was Treff who threw the fire bomb is established by the fact that a shell casing was found at Fay's residence which came from the same gun Treff used earlier to kill his wife. All of which also suggests that Treff had this gun available for use should Fay have exited the house. Although we prefer to turn this case on the basis that Rule 404(b) has application, a good argument can be made that the act of killing Mrs. Treff was so "inextricably intertwined" with the fire-bombing of Fay's house that to exclude evidence of the former in the trial of the latter would have been "confusing and incomplete." [9]

9. It should be noted that the killing of Jennifer Treff and the attempted murder of Carol Fay on

For an update of cases bearing on Rule 404(b), *see United States v. Record*, 873 F.2d 1363 (10th Cir.1989). We hold that in the instant case the evidence, in the form of a stipulation that Treff killed his wife, was admissible under Rule 404(b) in Treff's trial for fire-bombing Fay's home because it tended to show that Treff was the one who threw the fire bombs and also tended to show his intent, motive and preparation or plan. It should be remembered that no witness identified Treff as the thrower of the fire bombs, and that he never confessed to such. Accordingly, the government had to prove by circumstantial evidence that Treff was the one who threw the fire bombs. This was established, rather convincingly, by showing that Treff killed his wife by firing four shots into her body, that three shell casings were found at the scene of the killing, and that the fourth casing was found in the vicinity of the automobile used by the person who threw the fire bombs at Fay's home. Counsel suggests that this could have been done in a different and less prejudicial manner. This does not appear to have been raised in the trial court. In any event, whether this evidence could have been presented in a less prejudicial manner is not determinative. The issue is whether the requirements of Rule 404(b) have been met. We think they have.

## IV. Admission of Diary Entry

At about the same time Treff was having problems with Fay at the IRS office in Salt Lake City he was also having domestic problems at home. He and his wife each filed for divorce in January, 1986, but they had been having domestic problems for some time prior thereto. On advice of her counsel, Mrs. Treff was keeping a diary of her husband's conduct. The day after her death, investigators found in Mrs. Treff's house her diary with an entry dated January 4, 1986, which read as follows:

> Robert slept downstairs—still angry and upset mood. Finally asked if state would pay medical bills if he committed himself because he wanted to kill self and Fay.

The diary entry was identified by Mrs. Treff's sister as being in Mrs. Treff's handwriting.

In a hearing held during the trial, the district court, after hearing testimony and argument of counsel, ruled that the government could introduce the diary entry into evidence. At that hearing, incidentally, Mr. Treff testified that he had never made that statement to his wife, and that any statements he had made were confidential marital communications. The district court refused to find that the statement attributed to Mr. Treff in Mrs. Treff's diary entry was a confidential marital communication because of the nature of the relationship between Mr. and Mrs. Treff at the time of the alleged statement.[10] We are not inclined to disturb this holding. The Treffs had been separated since October, 1985. Treff had been dating other women and indeed had made a proposal of marriage and became engaged to one. The fact that Treff "slept downstairs" once didn't alter their estrangement. And by the end of January, 1986, both had filed for divorce. Without going into further detail concerning their marital breakup, we agree with the district court that this diary entry was not the result of a confidential marital communication.[11]

the same night are also tied together by the "Justice List." The Justice List, which was composed by Treff, is a list of names of people against whom Treff sought revenge. It is significant that Treff included both the names of his wife, Jennifer Treff, and his ex-boss, Carol Fay, on this list. Thus, the motive of revenge links these two crimes.

**10.** The district court found, based on testimonial and other evidence, that the Treffs had been separated and living apart since October, 1985,

and, therefore, the communications privilege did not apply. There was extensive evidence that the marriage had failed and no evidence of any attempt at reconciliation.

**11.** For cases where the confidential marital communication privilege has not been applied to a failed or failing marriage, *see United States v. Roberson*, 859 F.2d 1376 (9th Cir.1988); *In re Witness before Grand Jury*, 791 F.2d 234 (2d Cir.1986); and *United States v. Byrd*, 750 F.2d 585 (7th Cir.1984).

■ The district court also ruled that the use of the diary entry did not violate the hearsay rule. The statement attributed to Mr. Treff was an admission and, therefore, not hearsay under Rule 801(d)(2). The entry itself was admissible under the residual provision of either Rule 803(24) or Rule 804(b)(5). We agree with the district court that the diary entry had "circumstantial guarantees of trustworthiness."

■ We reject the further suggestion that the prosecutor did not give Treff sufficient notice of his intent to use the diary entry at trial. Defense counsel had the diary entry for at least a year prior to trial, and about five days before trial defense counsel was given notice that the government would offer the diary entry at trial. There is little doubt that the entry was made by Mrs. Treff. There is no suggestion as to just how the defense was in any way prejudiced by any delay in notifying counsel of the government's intent to introduce the diary entry into evidence.

### V. Sufficiency of Evidence

■ Counsel argues that there is insufficient evidence to support Treff's convictions on Counts I and II. As to Count I, counsel asserts that there is insufficient evidence to show that Treff had an intent kill Fay, if indeed he was the party who threw the Molotov cocktails. As to Count II, counsel states that there was insufficient evidence to show that Treff had an intent to assault and forcibly intimidate Fay. We do not agree.

Assuming that Treff was the bomb thrower, an assumption supported by overwhelming evidence, the direct and circumstantial evidence of Treff's intent is sufficient to support the convictions on both counts. The Molotov cocktail, a makeshift incendiary bomb made with a breakable bottle full of a flammable liquid and equipped with a rag wick, is itself a deadly weapon.[12] Further, Treff had made numerous threats against Fay's life. Mrs.

Treff's diary entry, although quite probative of Treff's intent, was certainly not the only evidence of threats. In addition, the fact that the fourth shell casing was found on Fay's premises permits the inference that Treff had his 9 mm handgun with him at the time of the fire-bombing. The fact that the fire bombs fortunately did relatively little damage does not detract from Treff's intent.

At this stage of the proceedings where there is a challenge to the sufficiency of the evidence, the evidence, both direct and circumstantial, together with the reasonable inferences to be drawn therefrom, is sufficient if, when taken in a light most favorable to the government, a reasonable juror could find the defendant guilty beyond a reasonable doubt of the crimes charged. *United States v. Hooks,* 780 F.2d 1526, 1532 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). The evidence of intent is sufficient to support the convictions on Counts I and II.

Judgment affirmed.

---

12. Molotov cocktails have historically been used as deadly weapons. For example, they were used very effectively in World War II by the Russians in resisting the drive of Nazi Germany into Russia.