**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BOBBY JACK JENKINS,

    Defendant - Appellant.

No. 12-8089
(D.C. No. 1:12-CR-00061-NDF-1)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **GORSUCH, HOLLOWAY,** and **HOLMES,** Circuit Judges.

Bobby Jack Jenkins, the Defendant - Appellant, made a series of threatening and obscene telephone calls to government offices in Wyoming. He was arrested and charged with three counts of making interstate communications with the intent to injure, in violation of 18 U.S.C. § 875(c). A jury convicted him on two of the counts, and the district court sentenced him to fifty-one months in prison.

---

[*] After examining the briefs and appellate record, this panel has decided unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Mr. Jenkins now challenges his conviction, arguing the district court committed two serious errors. First, he argues the district court abused its discretion by permitting him to participate as "co-counsel" at his trial. He says the district court knew he was not mentally competent to act in such a capacity but let him proceed anyway. Second, he claims the district court erred in allowing the introduction of his cellular-telephone records into evidence without a proper foundation for their admission at trial. Because those records were crucial in establishing a key element of the offense charged—the making of a communication across state lines—Mr. Jenkins contends the district court's alleged error in admitting them requires reversal of his conviction.

Our jurisdiction arises under 28 U.S.C. § 1291, and we AFFIRM the judgment of the district court in all respects.

## I. BACKGROUND

### *A. Factual Background*

At the beginning of 2012, Bobby Jack Jenkins was an angry man. He was angry at the federal government. He was angry at the State of Wyoming. Most of all, he was angry about how he was supposedly being unjustly denied payment of disability benefits. For this, Mr. Jenkins specifically blamed the government agencies responsible for processing and approving his disability claim: the federal Social Security Administration (SSA) and its state-government counterpart in Wyoming, the Office of Disability Determination Services (DDS).

The trouble leading to Mr. Jenkins's arrest in this case had its start on January 10, 2012, when he left a voicemail message with an SSA employee in Wyoming. In the

message, he darkly suggested that "someone is going to come to your office and start shooting people" if they did not "get their act together." R. Vol. 2, at 30. As a result of this telephone call, Mr. Jenkins was banned from conducting business in person at any SSA office. On February 6, 2012, Mr. Jenkins called the DDS office in Cheyenne, Wyoming and asked that someone call him back about his disability claim. He left his cellular-telephone number as his contact number in his message.

Later that afternoon, DDS Deputy Administrator Jeff Graham returned Mr. Jenkins's telephone call. Mr. Jenkins became agitated during the ensuing conversation with Mr. Graham and began making profanity-laden threats, the gist of which was that he was going to take his rifle and start shooting government employees. He then hung up on Mr. Graham, who promptly reported the threats to the authorities. But Mr. Jenkins was not finished with his tirade. Around 8:30 that night, Mr. Jenkins called the Cheyenne DDS office and left two more voicemail messages in fairly rapid succession. At the beginning of each call, Mr. Jenkins identified himself by name, date of birth, and Social Security number.

Mr. Jenkins's first message consisted of a fusillade of colorful and violent threats, which, as before, mainly involved his assurances that he was going to shoot government employees in government offices, along with anyone in law enforcement who tried to stand in his way. In the message, Mr. Jenkins hinted that he was currently somewhere in the Sawtooth Wilderness, located in Idaho, but that he would "find a way" to get to Wyoming to make good on his threats. *Id.* at 31-32. Apparently, the second message left by Mr. Jenkins also contained similar threats, but the call was broken and the sound

-3-

quality of the voicemail was poor. Owing to Mr. Jenkins's threats, the DDS office in Cheyenne was closed for the next several days as a security precaution.

*B. Procedural Background*

A federal warrant was issued for Mr. Jenkins's arrest on February 9, 2012. On that same day, the federal district court in Wyoming issued an order under 18 U.S.C. § 2703(d) to AT&T, Mr. Jenkins's cellular-service provider, directing the company to produce his telephone records. These records would later be introduced against Mr. Jenkins at trial to prove his threatening phone calls had been made from outside the state of Wyoming and thus had been transmitted in interstate commerce. Mr. Jenkins was tracked down and arrested on February 11, 2012 in Livingston, Montana. He was charged by grand-jury indictment with three counts of transmitting a threatening communication in interstate commerce, in violation of 18 U.S.C. § 875(c).

Following his indictment, the district court ordered Mr. Jenkins to undergo a competency evaluation. The examining physician determined that Mr. Jenkins was competent to proceed to trial. At a competency hearing held before the district court on July 19, 2012, Mr. Jenkins and the government both stipulated to the findings and conclusions contained in the examining physician's report, and the district court found Mr. Jenkins competent to stand trial.

About six weeks before his trial was set to begin, Mr. Jenkins filed a handwritten *pro se* "Motion for Co-Counsel" with the district court. *See* R. Vol. 1, at 36-43. Although he expressed dissatisfaction with his court-appointed lawyer (along with a rambling litany of other sharply worded grievances), Mr. Jenkins did not ask to proceed

-4-

at trial *pro se*, otherwise waive his right to counsel in any other manner, or expressly ask for new counsel. The district court denied the "Motion for Co-Counsel," finding that Mr. Jenkins had not stated any legal basis for his requested relief and noting that Mr. Jenkins's court-appointed lawyer was "as capable and competent as any counsel that could be appointed to" represent him. *Id.* at 45.

The matter of Mr. Jenkins's legal representation appeared to be settled until, a few days before trial, he mailed a letter to his lawyer suggesting he no longer wanted the lawyer to represent him. Raising the issue of the letter at a conference before the district-court judge on the morning of trial, Mr. Jenkins's counsel duly attempted to withdraw his representation. The district court stated that it was disinclined to grant the motion but would wait to "hear Mr. Jenkins out on how the relationship is going" before making a final ruling. R. Vol. 3, pt. 1, at 80.

With Mr. Jenkins present in the courtroom, along with defense and government counsel, the district court then engaged in a thorough colloquy with Mr. Jenkins concerning what, in essence, Mr. Jenkins wanted to do about his legal representation at trial. Mr. Jenkins assured the court that he did not wish to represent himself. He wanted only to act as "co-counsel" because, as he put it, "I might have some questions I need to ask," *id.* at 132, and his participation as co-counsel "means I have a voice also," *id.* at 131. After carefully outlining a protocol whereby Mr. Jenkins could participate as co-counsel, the district court granted his request, with the agreement that his role at trial would be confined to asking limited follow-up questions after his lawyer had finished direct or cross-examination of a witness.

-5-

The government called five witnesses against Mr. Jenkins at trial. Three of the witnesses were SSA or DDS employees threatened by him; the other two were law-enforcement officers responsible for investigating and apprehending him. Acting as co-counsel, Mr. Jenkins briefly cross-examined three of the witnesses. His active trial participation never extended beyond this limited questioning.

One of the witnesses, Senior Special Agent Kalvin Boggs of the Federal Protective Service, testified in some detail about Mr. Jenkins's cellular-telephone records, which had been provided to the government by AT&T under court order. Counsel for Mr. Jenkins objected to the introduction of the records, arguing there was not a proper foundation for their admission. The district court overruled the objection, finding that the records fell within the business-records exception to the hearsay rule under Federal Rule of Evidence 803(6). The district court also determined the records were self-authenticating and properly certified for admission under Federal Rule of Evidence 902(11). With the defense's objection overruled, Agent Boggs explained that the telephone records showed that Mr. Jenkins's cellular-telephone calls were actively "pinging" or bouncing off of a cellular tower in the vicinity of Livingston, Montana during the periods when he was making threatening calls to the government offices in Wyoming.

Mr. Jenkins did not call any witnesses on his own behalf, and he did not testify. The jury found Mr. Jenkins guilty on two of the three counts,[1] and the district court

---

[1] Mr. Jenkins was found not guilty on the count stemming from his January 10, 2012 telephone call to the SSA office in Wyoming. He was convicted on the two counts

sentenced him to fifty-one months' imprisonment, to be followed by three years of supervised release. Mr. Jenkins timely appealed.

## II. DISCUSSION

On appeal, Mr. Jenkins raises two points of error. First, he argues the district court abused its discretion by allowing him to act in the role of co-counsel. Second, he contends the district court committed reversible error by admitting his telephone records without a proper foundation at trial. We assess both of Mr. Jenkins's arguments in turn. Finding neither argument persuasive, we affirm for the reasons set forth below.

### A. *Hybrid Representation*

Mr. Jenkins asked for a hybrid form of representation at trial. In other words, he wished for his defense to be conducted "partly by himself and partly by his attorney[]." *United States v. Hill*, 526 F.2d 1019, 1024 (10th Cir. 1975). Mr. Jenkins's hybrid representation was structured such that he could ask limited follow-up questions of witnesses after his court-appointed counsel had concluded his own examination; he would not play any other active part in presenting his defense. Mr. Jenkins agreed to these boundaries and operated within them, without incident, throughout his trial. But, having received the hybrid representation that he requested, Mr. Jenkins now says the district court abused its discretion in granting it. We disagree.

---

relating to the threats made in his February 6, 2012 calls to the Cheyenne DDS office. The first of these counts arose from his telephone conversation with Mr. Graham that afternoon; the second, from his first voicemail message to the DDS office left later that night.

Although the "hybrid" nature of hybrid representation derives from two distinct constitutionally guaranteed rights—the right of self-representation and the right to counsel in criminal cases—there is no constitutional right to hybrid representation itself. *United States v. Bennett*, 539 F.2d 45, 49 (10th Cir. 1976); *Hill*, 526 F.2d at 1025 ("The Sixth Amendment does not give any indication that hybrid representation is a right of constitutional dimensions."); *see also United States v. Treff*, 924 F.2d 975, 979 n.6 (10th Cir. 1991) ("It should be noted that a defendant has no right to hybrid representation and a request to proceed in such a manner is not deemed an election to proceed *pro se*."). From a constitutional standpoint, hybrid representation is decidedly less than the sum of its parts.

Accordingly, we recognize permission for hybrid representation "as being discretionary with the trial court." *Bennett*, 539 F.2d at 49; *see also Treff*, 924 F.2d at 979 n.6 ("The decision to allow hybrid representation and to limit the defendant's participation in such representation is within the discretion of the trial court."). When reviewing for abuse of discretion, "we will reverse a determination only if the court 'exceeded the bounds of permissible choice,' given the facts and the applicable law in the case at hand." *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007) (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)). An abuse of discretion is marked by "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment" on the part of the district court. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (quotation omitted).

Mr. Jenkins argues on appeal that the district court abused its discretion in granting his request for hybrid representation because, in doing so, it ignored his purportedly obvious mental problems and the harmful effect that those problems would have on his efforts as co-counsel. According to Mr. Jenkins, the court was "fully aware" that he suffered from "obvious mental deficits that he displayed both prior to the trial, and during the course of the trial." Appellant's Br. at 15. For this reason, Mr. Jenkins contends, it was improper for the district court to put him in a position where the jury could become unfairly prejudiced against him due to the supposedly bizarre behavior he displayed while questioning witnesses on his own behalf at trial.

We think Mr. Jenkins's contentions are belied by the trial record. Prior to trial, Mr. Jenkins submitted to a court-ordered competency evaluation and, following a hearing, was found competent to stand trial. To be sure, the fact that Mr. Jenkins was competent to stand trial is not the same thing as saying he was competent to represent himself, even in the limited capacity contemplated by the hybrid representation in this case. *See Indiana v. Edwards*, 554 U.S. 164, 175 (2008) (cautioning "against the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself"). That is to say, a criminal defendant may be "found mentally competent to stand trial if represented by counsel but not mentally competent to conduct that trial himself." *Id.* at 167.

But this is not such a case. To begin with, Mr. Jenkins was not asking to represent himself alone at trial, to the exclusion of any assistance from counsel. Nor was counsel

-9-

imposed on him by the court against his clearly stated wishes to the contrary. To the extent that Mr. Jenkins—who had already been found mentally competent to stand trial—was requesting that the district court allow him to present brief and discrete portions of his defense without any assistance from counsel, the district court needed only to satisfy itself that Mr. Jenkins "voluntarily and intelligently elect[ed] to do so." *Faretta v. California*, 422 U.S. 806, 807 (1975). Here, the district court accomplished this through a meticulous and exhaustive discussion on the record with Mr. Jenkins about (1) his reasons for, and the implications of, acting as co-counsel, and (2) the parameters of his participation in that capacity. The trial record reflects that Mr. Jenkins gave lucid answers and made cogent remarks to the district court throughout their exchange. In short, he understood what he was doing, and so did the district court.

Mr. Jenkins briefly cross-examined only three of the witnesses against him at trial: Carol Russo, the assistant district manager of the SSA office in Cheyenne; Mr. Graham, of the DDS office; and Agent Boggs. His total interaction with the witnesses was minimal and, in all likelihood, could not have totaled more than a couple of minutes out of a trial that lasted three days. *See* R. Vol. 3, pt. 2, at 374 (Mr. Jenkins's full cross-examination of Ms. Russo); *id.* at 433-34 (Mr. Jenkins's full cross-examination of Mr. Graham); *id.* at 509 (Mr. Jenkins's full cross-examination of Agent Boggs). We concede the point to Mr. Jenkins that his line of cross-examination—more accurately described as a blend of questions and commentary—probably did him no favors with the jury. It could fairly be described as unfocused and not particularly germane to the issues at trial. His statements might have seemed odd or off-putting. But that, in itself, is not the stuff

-10-

of reversible error. Having reviewed the three very brief snippets of cross-examination by Mr. Jenkins found in the record, we cannot reasonably say that the jury somehow grew irrationally prejudiced against him because of the questions he asked or the manner in which he asked them.[2]

We hold the district court did not abuse its discretion in granting Mr. Jenkins's narrow and limited request for hybrid representation. And, even if the district court did abuse its discretion in allowing the hybrid representation, we are convinced that any such error was harmless. "A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *United States v. Resendiz–Patino*, 420 F.3d 1177, 1181 (10th Cir. 2005) (quotation omitted). We do not believe that Mr. Jenkins's participation as co-counsel could have had any substantial influence on the outcome in this case.

### B. The Admissibility of the Cellular-Telephone Records

For his second point of error, Mr. Jenkins argues the district court abused its discretion by admitting his cellular-telephone records into evidence at trial without a proper foundation. The district court permitted the government to authenticate the records at trial by way of a written certification and accompanying affidavit from AT&T's custodian of records. The records in question provided information about each call made or received by Mr. Jenkins's cellular telephone between January 9, 2012 (the

---

[2] The district court had also specifically instructed the jury that "if the defendant chooses to examine witnesses, treat the defendant as you would treat a lawyer in the case. Remember, the defendant's questions when he's acting as co-counsel are not testimony from the defendant." R. Vol. 3, pt. 2, at 300.

day before he first left an ominous voice message with the SSA office in Cheyenne) and February 7, 2012 (the day after he made the threatening series of calls to the Wyoming DDS office). They included latitudinal and longitudinal information for the cellular towers through which those calls were routed.

The records were used at trial to show Mr. Jenkins had made the calls to the government offices in Wyoming from somewhere in the vicinity of Livingston, Montana, a town some sixty miles north of the Wyoming–Montana border. Mr. Jenkins asserts that the telephone records should never have been admitted because they were not introduced through the live testimony of a witness who could vouch for the trustworthiness of their contents. In other words, he argues that the certification from the AT&T records custodian was an inadequate foundation for their admission in this case.

We review the district court's evidentiary rulings for abuse of discretion. *United States v. Ary*, 518 F.3d 775, 785 (10th Cir. 2008). These rulings "generally are committed to the very broad discretion of the trial judge, and they may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." *United States v. Keck*, 643 F.3d 789, 795 (10th Cir. 2011) (quotation omitted). We give particular deference to the district court's rulings on the admissibility of hearsay evidence. *Id.* Even if we determine there was "an erroneous evidentiary ruling, a new trial will be ordered 'only if the error prejudicially affects a substantial right of a party.'" *Id.* (quoting *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir. 1993)).

The telephone records in this case fell within the business-records exception to the hearsay rule, Federal Rule of Evidence 803(6). Rule 803(6) carves out an exception to the general rule against hearsay for records "kept in the course of a regularly conducted activity of a business . . . [if] making the record was a regular practice of that activity." "The rationale behind this exception is that business records 'have a high degree of reliability because businesses have incentives to keep accurate records.'" *Ary*, 518 F.3d at 786 (quoting *United States v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006)). In order to be admissible under Rule 803(6)'s business-records exception, the proposed document

> must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events recorded; (3) be based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant; and (4) indicate the sources, methods and circumstances by which the record was made were trustworthy.

*Id.*

Rule 803(6) further provides that these prerequisites for admissibility may be satisfied "by a certification that complies with [Federal Rule of Evidence] 902(11)." Working hand in glove with Rule 803(6)'s business-records exception, Rule 902(11) "permits a party to establish the authenticity of documents as domestic business records through a declaration from the records' custodian." *United States v. Lewis*, 594 F.3d 1270, 1278 (10th Cir. 2010). This is subject to the requirement that the proponent "must give an adverse party reasonable written notice of the intent to offer the record—and

must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them." Fed. R. Evid. 902(11).

In this case, the government argues that the certification and affidavit made by AT&T's custodian of records fully complied with the requirements of Rule 902(11) and thus provided the necessary foundation for the admission of Mr. Jenkins's telephone records as business records under Rule 803(6). Mr. Jenkins, however, claims he was "caught off guard by the use of the certification" because he had anticipated the government would present in-person courtroom testimony from an AT&T representative in order to authenticate the records. Appellant's Br. at 18. To be fair to Mr. Jenkins, it seems the government had indeed initially planned on using such a witness, but the witness was unavailable at the time of trial. Because of this, the government instead relied on the certification and affidavit obtained from the AT&T custodian of records to lay the foundation for admitting the documents.

We conclude that there was nothing improper whatsoever about the government's use of the certification procedure expressly allowed by Rule 902(11). The contents of the records themselves had already been furnished to Mr. Jenkins in the course of discovery; there was no ambush at trial. Here, the government scrupulously followed Rule 902(11)'s certification mechanism in reliably laying the foundation for the admission of Mr. Jenkins's telephone records under Rule 803(6).[3]

---

[3] Mr. Jenkins seemed to argue before the district court that the certification and affidavit were themselves unreliable because those documents had been prepared for use at trial. *See* R. Vol. 3, pt. 2, at 476-77. To the extent Mr. Jenkins was suggesting that cellular-telephone records and accompanying Rule 902(11) certifications are testimonial

As a final argument, Mr. Jenkins claims that Agent Boggs was not qualified to testify about the AT&T records and that the records should have been held inadmissible for that reason. The problem with this argument is that Agent Boggs's testimony had nothing to do with authenticating the records, establishing their accuracy and trustworthiness, or otherwise laying the foundation for their admission. Agent Boggs was called to testify about law enforcement's use of the telephone records in determining Mr. Jenkins's location following his threatening calls to the DDS office on February 6, 2012. His testimony played no part in authenticating the records or establishing their trustworthiness; those requirements were satisfied by the government's submission of the certification and affidavit under Rule 902(11). And, although Mr. Jenkins could conceivably have raised an objection at trial as to whether Agent Boggs was qualified to interpret the actual contents of the telephone records for the jury, he did not do so—nor does he raise that argument on appeal.

Agent Boggs's testimony had nothing to do with laying the foundation for the records' admission. That aim was accomplished through the government's entirely proper use of the certificate and affidavit obtained from AT&T's custodian of records. In sum, Mr. Jenkins's claim of error on this point is without merit.

### III. CONCLUSION

---

in nature and therefore implicate the Sixth Amendment's Confrontation Clause, that argument has been foreclosed by our decision in *United States v. Yeley–Davis*, 632 F.3d 673 (10th Cir. 2011). In *Yeley–Davis*, we plainly held that "certificates of authenticity presented under Rule 902(11) are not testimonial." *Id.* at 680. The purpose of the certification is "merely to authenticate the cell phone records—and not to establish or prove some fact at trial." *Id.* At any rate, Mr. Jenkins does not raise a Confrontation Clause argument on appeal.

For the foregoing reasons, the judgment of the district court is AFFIRMED in all respects.

Entered for the Court


William J. Holloway, Jr.
Circuit Judge