FILED
United States Court of Appeals
Tenth Circuit

July 1, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BARRY KECK, a/k/a Lonekoyte,

Defendant-Appellant.

No. 10-8008

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 09-CR-140-ABJ)**

Thomas A. Fleener, Fleener & Vang, LLC, Laramie, Wyoming, for Appellant.

Stuart S. Healy III, Assistant United States Attorney (Christopher A. Crofts, United States Attorney, with him on the brief) Office of the United States Attorney, Cheyenne, Wyoming, for Appellee.

Before **MURPHY**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

A federal jury found Barry Keck guilty on eight counts relating to a drug and money-laundering conspiracy based in Wyoming. Keck now appeals his conviction, contending the jury's verdict rests on insufficient evidence and

improper evidentiary decisions by the district court. He also contends the district court erred in applying the United States Sentencing Guidelines (USSG or the Guidelines). We find no legal basis to reverse the conviction, and any error in applying the Guidelines did not affect his sentence.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. Background

Barry Keck was the ringleader of a drug conspiracy to distribute methamphetamine in several Mountain West states. About once a week, he would travel to Oregon to purchase drugs for distribution in Wyoming, Montana, and South Dakota. In 2008, agents from the Drug Enforcement Agency (DEA) and the Wyoming Division of Criminal Investigation (DCI) began an investigation, gathering evidence from confidential informants, controlled purchases, physical and video surveillance, and other sources. They then received authorization from the district court to intercept calls and text messages sent or received by Keck's mobile phone. After monitoring Keck's phone "seven days a week . . . 15 to 18 hours a day" between November 2008 and January 2009, DEA and DCI agents intercepted 8,078 calls, 3,181 of which were deemed pertinent to the conspiracy.

In several intercepted calls, Keck discussed distributing methamphetamine and traveling to Oregon to purchase drugs from a distributor. DEA agents also recorded Keck negotiating drug prices and involving his 17-year-old daughter in

drug sales.  Finally, on some intercepted calls Keck discussed wire transfers used as part of the conspiracy.

In 2009, Keck was charged with seven counts relating to a conspiracy to possess with intent to distribute methamphetamine and one count related to a conspiracy to launder money.  He pleaded not guilty and was tried before a jury, which convicted him of all counts.  After the district court sentenced him to life imprisonment, Keck timely appealed.

## II.  Discussion

Keck makes the following contentions on appeal: (1) the jury lacked sufficient evidence to support his conviction; (2) the district court made several evidentiary errors that affected the trial's outcome; and (3) the district court's application of the Guidelines improperly resulted in a sentence of life imprisonment.  We find none of these arguments persuasive, and affirm for the reasons set forth below.

### A.  Sufficiency of the Evidence

Keck was convicted of participating in two criminal conspiracies: a conspiracy to distribute methamphetamine and a conspiracy to launder money. He contends the testimony of government witnesses did not adequately provide direct or circumstantial evidence of either conspiracy.  We disagree.

The sufficiency of the evidence to support a jury's verdict is reviewed de novo.  *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999).  On

appeal, we "ask only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotation marks and citation omitted). The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt. *See United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997). In conducting this review, we "may neither weigh conflicting evidence nor consider the credibility of witnesses." *United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir. 1997) (quotation marks and citations omitted). It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented. *See United States v. Nieto*, 60 F.3d 1464, 1469 (10th Cir. 1995).

### 1. *Evidence of the Drug Conspiracy*

To prove a criminal conspiracy, the government must show: (1) an agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged conspirators. *United States v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992).

At trial, the government presented the following evidence that Keck participated in a criminal conspiracy to violate the Controlled Substance Act, 21 U.S.C. §§ 801–971: (1) a series of wire-tap recordings and intercepted text

-4-

messages in which Keck personally discussed the purchase, transportation, and redistribution of methamphetamine; (2) his daughter's testimony about his role in the conspiracy, including his regular travel to Oregon to purchase drugs; (3) a DEA agent's expert and lay testimony regarding the evidence gathered during the investigation; and (4) drugs seized during the investigation. Altogether, the evidence easily proves all the elements of criminal conspiracy.

Keck contends the DEA agent's testimony, "we kind of put it all together in 2008," is vague and amounts to an admission that the agent did not have personal knowledge of the methamphetamine conspiracy. R., Vol. 3 at 226. But he was only referring to the information available at the beginning of the investigation, before investigators received authorization to monitor Keck's phone—as his next sentence indicates. *See id.* ("We put it all together from 2008 just to start our investigation . . . for me to officially start the investigation.") This early information was gathered over several years from witness interviews, telephone pin registers, recordings of drug purchases made by a confidential informant, and other sources. *Id.* at 224–28.

Keck also suggests the DEA agent could not identify him on the intercepts because he had no firsthand knowledge of Keck's voice. In fact, the DEA agent testified he became familiar with Keck's voice after "listen[ing] to him every day for months." *Id.* at 235. The thousands of intercepted calls involving Keck

support this testimony.  The DEA agent also stated he was able to link the recorded voice to Keck through physical surveillance.  *Id.* at 236.

In sum, the record amply demonstrates the DEA agent had personal knowledge of Keck's criminal activities.  When combined with the telephonic intercepts, his daughter's testimony, and the drugs themselves, the evidence was sufficient to support Keck's drug conspiracy conviction.

### 2. *Evidence of the Money-Laundering Conspiracy*

Keck also challenges the evidence supporting his money-laundering conviction.  The elements of a money-laundering conspiracy require the government to prove: (1) an agreement with another person to knowingly conduct a financial transaction involving the proceeds of specified unlawful activity, with the intent to further specified unlawful activity, in violation of 18 U.S.C. § 1956; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged conspirators. *See Evans*, 970 F.2d at 668; 18 U.S.C. § 1956(a)(1)(A)(I).

The government presented the following evidence in relation to the money-laundering conspiracy: (1) Western Union and MoneyGram wire-transfer records; (2) testimony from Western Union and MoneyGram employees that Keck was involved in wire transfers; (3) the daughter's testimony that she wired money to her father as part of the methamphetamine conspiracy, including money from individuals who owed Keck for previously fronted drugs; and (4) telephonic

intercepts related to money transfers used in the criminal conspiracy, including a recorded phone call in which a co-conspirator informs Keck she wired money to their methamphetamine source to help pay for the drugs that Keck was about to purchase.

Keck contends that, because the Western Union and MoneyGram employees could only testify that Keck's name appeared on money transfer records, the government failed to provide witness testimony that the transfers were used for money laundering and drug purchases. This misrepresents the evidence.

In fact, the government did present witness testimony by the defendant's daughter that money transfers were used for drug purchases. Specifically, she testified she wired money to her father almost every time he traveled to Oregon to purchase drugs. She also explained she would collect the money she wired to Oregon from individuals in Wyoming to whom her father had fronted drugs. And occasionally, her father would instruct her to distribute drugs and then wire the sale proceeds to him in Oregon. This testimony, which is corroborated by wire-transfer records and the telephonic intercepts, is sufficient evidence to support Keck's conviction for conspiring to launder money.

## B. Evidentiary Decisions

Keck next challenges the district court's decisions to exclude certain defense exhibits and to admit wire-transfer records. In particular, he claims the

district court abused its discretion by refusing to permit the use of exhibits demonstrating how his daughter's cooperation with the government would reduce her sentence. Furthermore, he argues the admission of the wire-transfer records violated his Sixth Amendment right to confrontation. Both evidentiary decisions, he alleges, caused reversible error and affected his trial's outcome.

Evidentiary rulings "generally are committed to the very broad discretion of the trial judge, and they may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1246 (10th Cir. 1998). Even if the court finds an erroneous evidentiary ruling, a new trial will be ordered "only if the error prejudicially affects a substantial right of a party." *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir. 1993).

*1. Proposed Exhibits Regarding the Daughter's Potential Sentence*

At trial, Keck sought to undercut his daughter's testimony by demonstrating how her cooperation with the government would reduce her sentence under the Guidelines from 151 months' imprisonment to 37 months' imprisonment. He proposed using two exhibits to make this point: the drug quantity table under USSG §2D1.1, to show how drug quantities correlate to offense levels, and the sentencing guideline table, to show the prison time she faced.

The district court prohibited the use of the exhibits on the grounds of relevancy, waste of time, and confusion of the jury. The court also held the exhibits would invade upon its responsibility to instruct the jury concerning the law. Nonetheless, the court told defense counsel he could "cross examine [Keck's daughter] to your heart's content" about her knowledge of the plea agreement, its likely impact on her sentence, and any resulting bias. R., Vol 3. at 429. Furthermore, the court stated that, if defense counsel could demonstrate the witness was competent on technical sentencing issues, such as safety valve, he could cross examine her on those topics. In the end, defense counsel chose not to cross examine her.

We see no abuse of discretion. In light of defense counsel's broad opportunity to cross examine the witness, the district court did not err in prohibiting potentially confusing and time-wasting exhibits. And since defense counsel chose not to cross examine her, he cannot demonstrate the court's evidentiary decision, even if in error, caused prejudice.

2. *MoneyGram Records of Wire Transfers*

As further evidence of a money-laundering conspiracy, the government introduced spreadsheets of MoneyGram transactions allegedly involving the defendant. Keck contends the admission of these spreadsheets denied him a right to confrontation under the Sixth Amendment. Applying our recent precedent in *United States v. Yeley-Davis*, 632 F.3d 673, 678–79, (10th Cir. 2011), *cert.*

*denied*, 131 S. Ct. 2172 (2011), we find the spreadsheets are non-testimonial and admissible as evidence.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. Amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 51 (2004), the Supreme Court held the Confrontation Clause guarantees a defendant's right to confront those who "bear testimony" against him. Under *Crawford*, out-of-court testimonial statements are inadmissible "unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2531 (2009) (citing *Crawford*, 541 U.S. at 54.). We have defined a testimonial statement as "a statement that a reasonable person in the position of the declarant would objectively foresee might be used in the investigation or prosecution of a crime." *United States v. Pablo*, 625 F.3d 1285, 1291 (10th Cir. 2010).

In *Yeley-Davis*, 632 F.3d at 678–79, we considered mobile phone records similar to the wire-transfer records in this case. We began by observing the phone records fell under the business-records exception to the hearsay rule, FED. R. EVID. 803(b). *Id.* at 678. We also noted the Supreme Court's suggestion in *Crawford* that business records are, by their nature, non-testimonial and hence not subject to the Confrontation Clause. *Id.* at 679 (quoting *Crawford*, 541 U.S. at 56

-10-

("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy.")). After examining the disputed phone records, we concluded they were not testimonial because they were created for the administration of the phone company's affairs and not for the purpose of establishing or proving some fact at trial. *Id.* (quoting *United States v. Green*, 396 F. App'x 573, 574–75 (11th Cir. 2010) (unpublished)).

*Yeley-Davis* controls our analysis in this case, although we recognize an ambiguity in the testimony authenticating the MoneyGram spreadsheets. MoneyGram's records custodian testified that he received the wire-transfer data in the form of computer-generated Excel worksheets, and that the records were not altered in any way. But he also testified, "I was asked to put them on one sheet, and I did . . . [by] cop[ying] the information and past[ing] it." R., Vol. 3 at 397. This testimony is ambiguous because the word "sheet" could refer to either (1) a spreadsheet (implying he created a compilation by combining data from several documents into a new one), or (2) a sheet of paper (implying he reformatted the document to fit related data together on one page).

Keck contends that, since the records custodian cut and pasted information, there is no way to know what data were retained or excluded. In response, the government contends the records custodian only moved data onto different pages so the government could introduce separate, authenticated exhibits for each

-11-

transaction, and therefore the exhibits, as a whole, contain all the information originally provided in the computer-generated spreadsheets.

Keck's argument is foreclosed by *Yeley-Davis*. Like the phone records in that case, the records of wire-transfer transactions involving Keck were created for the administration of MoneyGram's affairs and not the purpose of establishing or proving some fact at trial. *See Yeley-Davis*, 632 F.3d at 679. And since the underlying wire-transfer data are not testimonial, the records custodian's actions in preparing the exhibits do not constitute a Confrontation Clause violation.

Nor do these actions render the spreadsheets inadmissible as evidence. If the records custodian had created a compilation by copying data from several spreadsheets into a new document, then that compilation would be admissible as a summary under Rule 1006 of the Federal Rules of Evidence.[1] While a summary is admissible only if all the records from which it is drawn are otherwise admissible, *see State Office Sys., Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843, 845 (10th Cir. 1985); *United States v. Samaniego*, 187 F.3d 1222, 1223–24 (10th Cir. 1999), Keck's counsel conceded at oral argument that the original, computer-generated

---

[1] *See* FED. R. EVID. 1006 ("The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.").

Excel worksheets were business records for the purpose of the business-record exception to the hearsay rule.

Alternatively, if the records custodian merely repaginated the data so each transaction could be admitted as a separate exhibit, then the records would remain non-testimonial business records under Rule 803(6). *See United States v. Ary*, 518 F.3d 775, 786–87 (10th Cir. 2008) (describing the business-record hearsay exception's requirements). In the context of electronically-stored data, the business record is the datum itself, not the format in which it is printed out for trial or other purposes. As the district court concluded,

> I do not think that the Government needs to produce the computer from Minneapolis . . . . The fact that the document was downloaded, the information was pulled from that file cabinet, and placed on a tangible spreadsheet for—on a piece of paper, I don't think that changes the fact that it is a business record.

R., Vol. 3 at 400.

In any event, Keck cannot demonstrate any prejudice resulting from the exhibits' admission. First, even if the Excel spreadsheets were inadmissible, the data they contained were not. So the records custodian could testify to the data because they are non-testimonial and fall under the business-record hearsay exception. Second, the money-laundering conviction did not rest entirely—or even primarily—on wire-transfer records. These exhibits merely corroborated his daughter's uncontested testimony that wire transfers were used as part of a criminal conspiracy. Because her testimony was sufficient to establish the

-13-

elements of the money-laundering charge, Keck cannot demonstrate that the evidentiary decision to admit the wire-transfer records affected a substantial right.

In summary, the admission of the MoneyGram spreadsheets did not deny Keck a right to confrontation under the Sixth Amendment because the spreadsheets were not testimonial. And because the original spreadsheets constitute business records, the evidence is admissible, either directly under Federal Rule of Evidence 803(b) or as a summary under Federal Rule of Evidence 1006.

## C. The Sentencing Guidelines

Finally, Keck contends the district court misapplied the Guidelines by finding him responsible for a drug quantity over 1.5 kilograms and by applying upward adjustments on his drug-conspiracy conviction. The government agrees the district court erred in one respect, by incorrectly calculating the applicable offense level, but asserts the court's error was harmless.

We review sentences for procedural and substantive reasonableness. *United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006). To assess whether a sentence is reasonable, we first "determine whether the district court considered the applicable Guidelines range, reviewing its legal conclusions de novo and its factual findings for clear error. A non-harmless error in this calculation entitles the defendant to a remand for resentencing." *Id.* An error is harmless if it "did not affect the district court's selection of the sentence imposed." *United States v.*

-14-

*Labastida-Segura*, 396 F.3d 1140, 1143 (10th Cir. 2005). "In non-constitutional harmless error cases, the government bears the burden of demonstrating, by a preponderance of the evidence, that the substantial rights of the defendant were not affected." *United States v. Glover*, 413 F.3d 1206, 1210 (10th Cir. 2005).

*1. The District Court's Drug Quantity Determination*

Keck first contends the district court erred in finding him responsible for a drug quantity of over 1.5 kilograms, even though the jury only convicted him of conspiring to distribute over 50 grams of drugs.

Our precedents foreclose this argument. We held in *United States v. Magallanez*, 408 F.3d 672, 685 (10th Cir. 2005), that "when a district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard." Because *Magallanez* directly controls, the district court's drug-quantity determination was not clearly erroneous in light of the evidence presented at trial.

*2. Applicability of the Upward Adjustments*

Keck also claims the district court erred when it applied enhancements to the drug conspiracy offense. We disagree.

We begin with a brief overview of the Guidelines, which set forth a multi-step process for determining a recommended sentencing range. The Guidelines are divided into several chapters, each of which constitutes a particular step in the

-15-

process. For example, Chapter Two sets forth specific offenses, while Chapter Three details upward or downward adjustments, based on considerations such as obstructing justice or accepting responsibility. The first step in the sentencing process is to determine the offense section that is applicable to the offense of conviction, identify the appropriate offense level, and then follow the instructions contained in the applicable guideline. USSG §1B1.1(a)(1)–(2). The second step is to apply the adjustments described in Chapter Three. *Id.* at §1B1.1(a)(3). If there are multiple counts of convictions, a court should repeat these steps for each count, grouping the various accounts and adjusting the offense level accordingly. *Id.* at §1B1.1(4). Occasionally, in multiple-conviction cases, the offense level of one offense is determined by reference to a related offense in another guideline; in these cases, the adjustments ordinarily are also determined in respect to the referenced guideline. *Id.* at §1B1.5(c). For example, if a defendant bribed a public official in order to facilitate a fraud, then the bribery's offense level would be equal to the fraud's offense level, and any enhancement on the bribery offense for obstructing justice would be based on the underlying fraud. *Id.* at §2C1.1(c)(1).

At sentencing, the district court determined Keck's drug conspiracy convictions fell under USSG §2D1.1 and his money-laundering conviction fell under USSG §2S1.1. The offense level for the money-laundering offense is determined with reference to the offense from which the laundered funds were

-16-

derived, which in this case was the drug conspiracy. USSG §2S1.1(a)(1). But

Application Note 2(C) to §2S1.1 specifies:

> Notwithstanding §1B1.5(c) [the general instruction to base adjustments on the underlying offense], in cases in which subsection [§2S1.1](a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not the underlying offense from which the laundering funds were derived.

Accordingly, after calculating Keck's offense level under Chapter Two, the

district court applied three adjustments under Chapter Three: (1) a two-level

enhancement for the use of a minor under USSG §3B1.4; (2) a four-level

enhancement for being the organizer or leader of a criminal activity under

§3B1.1(a); and (3) a two-level enhancement for obstruction of justice under

§3C1.1.[2]

Keck does not dispute he engaged in conduct described by the

enhancements, but he argues this conduct related only to the drug conspiracy, not

the money laundering. Relying on Application Note 2(C), he contends Chapter

Three adjustments cannot be applied to his drug conspiracy unless the

adjustments related specifically to his money-laundering conviction.

---

[2] USSG §3C1.1 specifies:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct, or (ii) a closely related offense, increase the offense level by 2 levels.

We have not previously considered, in the context of multi-offense convictions involving money laundering, the applicability of enhancements that are based on other offenses.  Thus, whether Application Note 2(C) entirely prohibits Chapter Three adjustments unless they are based on the money-laundering offense, or merely prevents the double-counting that would arise if enhancements were applied to both the underlying crime and the money-laundering offense, is an open question.

The only circuit to have directly considered this issue has rejected an interpretation of Application Note 2(C) similar to that proposed by Keck.[3]  In *United States v. Byors*, 586 F.3d 222, 226–28 (2d Cir. 2009), the Second Circuit affirmed the sentence of a defendant who, like Keck, received a two-level increase under §3C1.1 for obstructing justice after being convicted of money laundering and other offenses.  The court rejected "the defendant's argument that an application note to a separate guideline implicitly 'creates an exception' to §3C1.1," because this interpretation "would negate, *sub silentio*, substantial portions of an entirely different guideline."  *Id.* at 228.

---

[3]  At this time, the only other federal case considering the meaning of this provision is *United States v. Cruzado-Laureano*, 440 F.3d 44, 48–49 (1st Cir. 2006), in which the First Circuit, in dicta, arguably adopts Keck's interpretation. The court held the enhancement was not applicable but on other grounds. *See id.* (holding §3B1.3 was inapplicable because "the money-laundering offense level was itself determined pursuant to a cross-reference that already required an upward adjustment based on abuse of trust").  Thus, the focus in *Cruzado-Laureano* was on whether the underlying offense affected the role of enhancements on the money-laundering offense, and not the reverse.

-18-

Instead, the court attempted to harmonize the commentary with the Guidelines by "treat[ing] references to the 'offense of conviction' in §3C1.1 as references to the offense of money laundering." *Id.* So in the context of money laundering, the court read the adjustment language as follows:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the [money laundering offense], and (B) the obstructive conduct related to (i) the defendant's [money laundering offense] and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

*Id.* Because the *Byors* defendant's obstruction (A) occurred during the money-laundering investigation and (B) related to fraud, which was a relevant conduct or at least an offense that closely related to the money-laundering offense, the court upheld the application of §3C1.1. *Id.*

In this case, if the district court had taken the Second Circuit's approach during sentencing and considered the Chapter Three adjustments with reference to the money-laundering conviction, it likely would have reached the same result. With regard to the obstruction of justice enhancement, Keck's drug conspiracy was closely related to the money-laundering offense. Although the other enhancements do not use §3C1.1's broad language, but only refer to "the offense," *see* USSG §3B1.1(a) (the adjustment for being the organizer of criminal activity) and §3B1.4 (the adjustment for using a minor), the record indicates they would have been appropriate even if they applied only to the money-laundering

-19-

conviction. Because Keck used his daughter, a minor, to wire money, an adjustment under §3B1.4 would be proper. Likewise, §3B1.1 is applicable, even under the Second Circuit's reasoning, because Keck organized a money-laundering conspiracy involving five or more participants. *See* R., Vol. 3 at 385–89 (identifying Keck and four other individuals as having sent or received wire transfers associated with the money-laundering conspiracy).

Nonetheless, we do not adopt wholesale the Second Circuit's approach. When applied to enhancements other than USSG §3C1.1, their construction has the potential of significantly negating the applicability of Chapter Three adjustments in multi-offense cases. Like the Second Circuit, "we construe the guideline and its commentary together and seek to harmonize them. If a harmonizing interpretation is possible, that is the proper one (so long as it does not violate the Constitution or a federal statute)." *See United States v. Pedragh*, 225 F.3d 240, 245 (2d Cir. 2000). But although "[t]he intent of the Sentencing Commission is demonstrated in part through its commentary," a district court is not obliged to follow the explanatory application if it is inconsistent with the Guidelines. *See United States v. Mojica*, 214 F.3d 1169, 1171 (10th Cir. 2000) (citing *Stinson v. United States*, 508 U.S. 36, 42–43 (1993)). Because Chapter Three adjustments often refer only to "the offense," substituting "the offense of money-laundering" would make many of these enhancements inapplicable on related offenses in some cases. Thus, a defendant convicted of a drug conspiracy

might receive a substantially lower sentencing recommendation if he or she was also convicted of money laundering. This paradoxical result is inconsistent with the Guidelines, which do not articulate a limitation in cases involving money laundering.

Instead, we interpret Application Note 2(C) as governing only the applicability of adjustments on money-laundering convictions, as opposed to the offense calculations of other, related offenses. Thus, the phrase "in cases where subsection (a)(1) applies" in the application note refers to "money-laundering convictions whose base offense level are determined by reference to the offense level of the underlying offense." Consequently, the sentencing court may still apply adjustments to other offenses of conviction for conduct relating to those convictions. This construction maintains consistency between the commentary and the Guidelines, while also achieving the application note's goal of preventing double-counting. *See United States v. Arthur*, No. 04-CR-122, 2006 WL 3857491 at *2 (E.D. Wis. Dec. 22, 2006).

With this construction in mind, the district court did not commit error by adding eight levels based on Chapter Three adjustments.

*3. The Total Offense Level*

Keck was convicted of multiple counts, requiring the district court to separately determine the offense level for each group and apply the greater of the two. *See* USSG §1B1.1(d); §3D1.3(a). Instead, the district court calculated a

total offense level of 46 for Keck's drug conspiracy group and then improperly added two levels based on a specific offense characteristic for money laundering. *See* R., Vol. 2 at 65.

Although the district court erred in this last step, its calculation of the offense level for Keck's drug conspiracy offense was otherwise correct. After finding Keck's drug conspiracy offense involved at least 1.5 kilograms of actual methamphetamine, the district court calculated a base offense level of 38 under USSG §2D1.1(c)(1). As noted above, the court then applied a two-level enhancement for the use of a minor under §3B1.4, a four-level enhancement for being the organizer or leader of a criminal activity under §3B1.1(a), and a two-level enhancement for obstruction of justice under §3C1.1. But the court declined to adopt a two-level increase under §2D1.1(b)(1) for the involvement of dangerous weapons. Thus, the court reached a final offense level of 46 for the drug-conspiracy offense.

Keck contends the offense level for his money-laundering conviction under §2S1.1 should have been 40. But since §3D1.3(a) requires a sentencing court to apply the greatest of the offense levels when a defendant has multiple convictions, Keck's minimum total offense level remains at 46—the properly-calculated offense level of Keck's drug-conspiracy conviction.

    *4. Whether the Error is Harmless*

According to the sentencing table, an offense level of 43 or above results in an advisory sentence of life imprisonment. Because the district court's error only increased Keck's offense level from 46 to 48, it did not affect Keck's advisory sentence.

Before imposing a sentence, the district court noted Keck was "a major source of methamphetamine for a lengthy period of time in northeast Wyoming, South Dakota, and Montana." R., Vol. 3 at 698. The court also observed,

> Something really needs to be done to speak clearly about this offense and the terrible damage that it has done and to allow the law to do its work by way of deterrence, advising other persons that they would be foolish to engage in this conduct. And the Court is at a point where, I have to admit, I am losing patience and have only the guidelines . . . to turn to for guidance in that respect.

*Id.* at 699. After concluding Keck "represents a threat to the community should he be released," the court found no circumstances to justify a variance and imposed the recommended sentence of life imprisonment. *Id.* at 700.

Thus, the district court indicated it relied on the Guidelines' advisory sentence, based upon (1) the severity of the offense; (2) the necessity to protect the community and to deter future drug conspiracies; and (3) the lack of circumstances justifying a variance. *See id.* And because the sentencing error did not affect either the advisory sentence or the district court's reasoning in imposing a life sentence, it did not affect the court's selection of the sentence Keck received. As a result, the sentencing error was harmless.

## III.  Conclusion

For the foregoing reasons, we AFFIRM Keck's conviction and sentence.