**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 17, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　　　　Plaintiff-Appellee,

v.

JAMES STEVEN MAXWELL,
a/k/a Jimmy Maxwell,

　　　　　Defendant-Appellant.

No. 11-5129
(D.C. No. 4:10-CR-00190-JHP-1)
(N.D. Okla.)

**ORDER AND JUDGMENT***

Before **TYMKOVICH**, **HOLLOWAY**, and **MATHESON**, Circuit Judges.

James Steven Maxwell was convicted by a jury of two counts of being a felon

in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  He

was sentenced to 195 months of imprisonment.  In this appeal from his conviction

and sentence, he argues four grounds for a new trial and/or resentencing:  (1) the

district court abused its discretion in denying his motion to sever the counts and hold

---

*After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

separate trials; (2) the district court erroneously denied his motion to exclude the in-court identification testimony of two witnesses; (3) the district court incorrectly found that he had three predicate convictions that qualified him for sentencing under the Armed Career Criminal Act (ACCA); and (4) the government did not present sufficient evidence to permit a reasonable jury to convict him of the offenses. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

## I.  BACKGROUND

Two incidents on two separate dates gave rise to the charges.

### A.  *First-Count Incident*

The first took place in the early morning hours of September 18, 2010. Barnsdall, Oklahoma police officer Danny Couffer was on patrol, accompanied by his wife, Angie Couffer. He observed a motorcycle being driven erratically. He pulled in behind the motorcycle and turned on his overhead lights. Instead of slowing down, the motorcycle sped up. Officer Couffer turned on his siren, which also proved futile, because the motorcycle continued to accelerate and led Officer Couffer on a high-speed chase. Eventually, the driver lost control of the motorcycle in a ditch, but he managed to roll to his feet in the middle of road.

Officer Couffer got out of his patrol car and stood about eight to ten feet away from the driver. The scene was illuminated by the patrol car's headlights and overhead light bar, which included red and blue flashing lights, as well as "white take-down lights." R. Vol. 2 at 26. During the ensuing face-off, the driver reached

inside his jacket. Officer Couffer believed the driver was reaching for a weapon, and he drew his firearm. While pointing his gun at the driver, Officer Couffer ordered him to show his hands and get on the ground. The driver smiled at Officer Couffer, who continued to repeat his commands. The face-off ended when the driver pulled his hand out of his jacket and put his hands in the air. He told Officer Couffer he did not have anything. *Id*. at 29. The driver fled on foot. Officer Couffer estimated that the confrontation lasted thirty seconds.

Other law enforcement personnel arrived at the scene. Officer Couffer, assisted by Deputy Sheriff Brett Barnett, righted the motorcycle. On the ground under where the motorcycle had come to a landing, they found a loaded pistol. Officer Couffer also searched the saddlebags, in which he found a cell phone, an envelope, and an address book. The name "Jeannie Maxwell" appeared on the home screen of the phone. The envelope was addressed to "Jimmy Don Maxwell" in Tulsa from "Jimmy Maxwell" in Oklahoma City. The name "James Maxwell" was written on the inside cover of the address book.

Several hours later, and after law enforcement had traced the ownership of the motorcycle to a James S. Maxwell, Sheriff Barnett showed Officer Couffer some photographs from the Department of Corrections (DOC). The photos depicted a person known as James Maxwell, and included his name, physical description, and criminal history. Sheriff Barnett asked if this was "[his] guy," *id*. at 101, and Officer

Couffer identified Mr. Maxwell as the driver of the motorcycle. At trial and over the objection of Mr. Maxwell's lawyer, he also identified Mr. Maxwell as the driver.

Ms. Couffer, who was riding in the patrol car with her husband, also testified about the events leading up to the face-off. She told the jury that she could see the motorcycle driver clearly when her husband got out of the patrol car to confront him: "My husband's headlights were on, and I just – I could see him. I mean, he was lit up because of the headlights." *Id*. at 109. When asked about the driver's facial expression, she said: "That he didn't care . . . that he was committing this crime. . . . Almost like a smirky smile." *Id*. at 111. She admitted being scared during the confrontation and described it as a memorable experience. A few hours later at their home, Officer Couffer showed his wife a photograph of Mr. Maxwell from the DOC. A few weeks later, Officer Couffer showed his wife a photo of Mr. Maxwell wearing an orange jumpsuit. At trial, she was also permitted, over the objection of defense counsel, to make an in-court identification of Mr. Maxwell as the driver.

B. *Second-Count Incident*

The second incident began in late September 2010, when a man brought two people to the home of Judy Moore to use the internet. They were introduced to her as "Jay and Jeannie," *id*. at 176, and they ended up staying with Ms. Moore for several days. During the course of their stay, Ms. Moore learned that "Jay" was "Jimmy Maxwell," *id*., and overheard a conversation in which Jeannie Maxwell was "trying

to get his bike out of impound," *id*. at 179.  The day after the Maxwells left, a federal agent came to Ms. Moore's home looking for Mr. Maxwell.

A few days later, the Maxwells came back to Ms. Moore's home.  She sent a text message to the federal agent to inform him that the Maxwells had returned.  He told her "to invite them in and keep them there." *Id*. at 181.  Mr. Maxwell observed a rifle in a bedroom and offered to buy it from Ms. Moore.  "[H]e said they were [living] in a rural environment, and he said something about needing that for protection[.]" *Id*. at 182.  Ms. Moore told him that she couldn't sell him the rifle because it was on loan from a neighbor.  But Mr. Maxwell took the rifle anyway and told her "that he would make it right someday, and they had to go." *Id*. at 191.

Ms. Moore and the neighbor who had loaned her the rifle reported it as stolen.  The deputy sheriff who took the report obtained the serial number of the weapon from the neighbor.  When the neighbor testified at trial, he did not recognize the weapon because the stock had been cut down and sanded.  He said the serial number on the rifle shown to him at trial matched the serial number of the rifle he loaned to Ms. Moore.

The supervisor in charge of fugitive warrants for the Tulsa, Oklahoma police department, Sergeant Thomas Sherman, received information on November 3, 2010, that Mr. Maxwell was staying at a motel in West Tulsa.  He met other law enforcement personnel at the motel and learned that Mr. Maxwell had just left.  They followed the vehicle in which they believed Mr. Maxwell was riding to a fast-food

restaurant, where the occupants went inside and picked up some food. After the group drove away from the establishment, law enforcement followed. Soon the occupants noticed they were being followed and executed a maneuver through a parking lot to test their suspicion. At that point, the officers decided to initiate a stop.

Sergeant Sherman testified that once the stop was made, "[t]he rear passenger door opened, and an individual [swung] around to the left, [and] put his feet out the door." *Id.* at 203. Sergeant Sherman recognized the individual as Mr. Maxwell, who "[t]ook a drink, turned and looked at us. We both indicated that he was under arrest and were yelling at him to get on the ground. And he turned to his right and ran[.]" *Id.* at 212. The officers gave chase. They quickly apprehended Mr. Maxwell and returned with him to the vehicle.

At trial, Mary Jo Cravatt testified that she had asked a friend, Dylan Perry, to drive her to the motel where her ex-husband, Mr. Maxwell, was staying. She told Mr. Perry that she was taking money to Mr. Maxwell. When they got to the motel, Mr. Maxwell and his wife Jeannie Maxwell got into Mr. Perry's vehicle with Mr. Perry and Ms. Cravatt. Ms. Cravatt testified that Ms. Maxwell had a purse and backpack, and Mr. Maxwell was carrying his Chihuahua. She described the trip to the fast-food restaurant and Mr. Maxwell getting out of the vehicle and running from the police.

In a statement given to law enforcement shortly after the incident, Ms. Cravatt wrote: "Jeannie said, oh, no, what about the gun?," *id*. at 230, and Mr. Perry said "What gun?," *id*. at 239. But at trial, she changed her story and said she could not remember whether it was Mr. Perry or Ms. Maxwell who mentioned the weapon. According to Ms. Cravatt, she gave the police misleading information to protect Mr. Perry, who was a convicted felon on probation and was not supposed to have a firearm. Ms. Cravatt testified that Ms. Maxwell threw something wrapped in a sheet or blanket in a yard near where the vehicle had been stopped.

Dylan Perry also testified at trial. He said that when he agreed to give Ms. Cravatt a ride to the motel, he did not know anything about Mr. Maxwell, including that he was a fugitive. He said that while the police were chasing down Mr. Maxwell, Ms. Maxwell threw a jacket from the vehicle, and "when the police found it, there was a gun in it." *Id*. at 238. She threw the jacket "[a]bout 20 feet from the car . . . [in] a yard." *Id*. at 239. Mr. Perry denied knowing that the Maxwells were in possession of a firearm or any discussion among the passengers about what to do with it.

Stephen Brenneman, an agent from the Bureau of Alcohol, Tobacco and Firearms (ATF), testified that another officer noticed a red plaid blanket lying in the yard next to the vehicle. Agent Brenneman "[l]ooked inside the blanket, and [] saw a Marlin Glenfield Model 60 .22 caliber rifle wrapped up in this red plaid blanket." *Id*. at 252. He emptied the ammunition and took some photographs. At trial, Agent

Brenneman identified the rifle as bearing serial number 25270045—the same serial number of the rifle Mr. Maxwell took from Judy Moore's house.

Another ATF agent, Eric Booker, testified about a telephone call that Mr. Maxwell made to his wife from jail on the evening of November 3, 2010.  The recording of the call was played for the jury.  On the recording, Mr. Maxwell asked, "What did they do about that deal . . . in the car?"  Aplee. Br. add. 1 (audio CD), at 13:29-37.  Ms. Maxwell responded, "You mean that gun that Mary Jo made me throw across the yard?"  *Id.* at 13:41-46.  Mr. Maxwell stated, "Oh yeah."  *Id.* at 13:47-48. Ms. Maxwell explained, "They winded up finding it."  *Id.* 13:49-51.  Mr. Maxwell responded, "Well, I already told em it . . ."  *Id.* at 13:52-54.  Before Mr. Maxwell completed his statement, Ms. Maxwell stated, "I was thinking to throw it out to get rid of it for you . . . I threw it as far as I could, and they didn't see it for the longest time.  I'm sorry I didn't do good enough." 14:14-14:34.  Mr. Maxwell responded, "Oh hey, don't you worry about it.  Hell, I should have took it with me."  *Id.* at 14:36-42.

\* \* \*

The jury found Mr. Maxwell guilty on both counts.  He was sentenced to 195 months of imprisonment as an armed career criminal.  This appeal followed.

## II.  DISCUSSION

A. *Motion to Sever*

Prior to trial, Mr. Maxwell moved to sever the two counts.  The district court denied the motion in a written order.  Rule 8(a) of the Federal Rules of Criminal Procedure permits the joinder of offenses that are of the same or similar character.  But to protect the defendant from prejudice, the court may order separate trials of the counts, "[i]f the joinder of offenses . . . for trial appears to prejudice a defendant[.]" Fed. R. Crim. P. 14(a).

We review the denial of a motion to sever for an abuse of discretion.  *United States v. Muniz*, 1 F.3d 1018, 1023 (10th Cir. 1993).  Under this standard, a defendant must demonstrate that his right to a fair trial was threatened or actually deprived. *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997).  "The defendant bears a heavy burden of showing real prejudice from the joinder of the two counts." *Muniz*, 1 F.3d at 1023.

The likelihood of prejudice is greater when offenses of a same or similar character have been joined for trial because "proof of one crime may tend to corroborate the commission of the other crime in violation of the evidentiary rules against evidence of a general criminal disposition or propensity to commit crime." *Id.*  Still, the burden showing prejudice is a heavy one, and Mr. Maxwell has not met it.

The parties agree that the counts were of the same or a similar character, but Mr. Maxwell argues that "join[d]er was improper . . . because the evidence regarding the same or similar conduct presented a[n] increased likelihood of prejudice to Mr. Maxwell because proof of one crime tended to corroborate the commission of the other crime, thus causing the jury to convict Mr. Maxwell based on a propensity to commit the crimes charge[d]." Aplt. Opening Br. at 19. He cites the following as prejudicial: the jury (1) would have believed that he had a propensity to carry firearms; (2) would have believed that he had a propensity to run from the police; (3) learned that the driver of the motorcycle lost his firearm when the bike hit the ground, and that within a month of the motorcycle incident he stole a firearm; and (4) learned that he was wanted on outstanding warrants involving the motorcycle incident, thus giving him a reason to evade capture.

These arguments fail to meet the "heavy burden of showing real prejudice." *Muniz*, 1 F.3d at 1023. We have explained that a defendant fails to meet his burden where: (1) "[t]he two counts were separate and distinct, and the evidence presented at trial was not too confusing or unfairly overlapping"; (2) "[t]he offenses took place on different dates at different locations, and different witnesses and evidence were presented on each count"; and (3) "the case for each count was strong enough on its own." *Id*. This case meets each of these elements. Thus, the district court did not abuse its discretion in denying Mr. Maxwell's motion to sever.

B. *In-Court Identifications*

According to Mr. Maxwell, the district court erred in allowing Officer Couffer and his wife, Angie Couffer, to make in-court identifications of Mr. Maxwell as the motorcycle driver. As to Officer Couffer, he argues that the fast-unfolding events at the scene, coupled with "[t]he display of a DOC page with Mr. Maxwell's name and picture on it, a physical description, and a listing of prior cases was so unnecessarily suggestive that any in-court identification would involve a very substantial likelihood of irreparable misidentification." Aplt. Opening Br. at 24. His argument regarding Ms. Couffer is essentially the same, i.e., her in-court identification was unreliable because of the stress of the situation and poor opportunity to observe the driver, along with the fact that her husband showed her a photo of Mr. Maxwell wearing an orange jumpsuit just a few hours after the standoff.

"[T]he ultimate conclusion of the constitutionality of identification procedures is a mixed question of law and fact which is subject to de novo review. We review the district court's factual findings for clear error." *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (internal quotation marks and citation omitted).

The government conceded at trial that "the situation regarding [Officer Couffer's] identification is not ideal." R. Vol. 2 at 57. But the test is not whether an identification procedure is ideal. "[W]e first examine whether the procedure was unnecessarily suggestive." *Bredy*, 209 F.3d at 1195. "If the court determines that the procedure was unnecessarily suggestive," we then "evaluate the reliability of the

- 11 -

identification under the totality of the circumstances to determine whether the suggestive [procedure] created a substantial likelihood of irreparable misidentification." *Id.* (internal quotation marks omitted).

In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court held that the following factors should be considered in determining whether an in-court identification is reliable:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199.

The district court did not rule on the suggestiveness of the identification procedure. Instead, the court analyzed the reliability of Officer Couffer's identification and concluded: "After hearing the testimony of [Officer Couffer], I'm convinced that he meets the *Biggers* rules, and I'm satisfied that his identification is trustworthy." R. Vol. 2 at 63. As to Ms. Couffer, the court likewise concluded that her identification was reliable under the factors set forth in *Biggers*, and allowed her to make an in-court identification.

Officer Couffer had ample opportunity to view Mr. Maxwell during the standoff. Although it was dark, the scene was illuminated by the patrol car's headlights and emergency lights. The confrontation, during which Officer Couffer was about eight to ten feet away from the suspect, lasted about thirty seconds. He

was close enough to observe a smile on the driver's face, and identify some articles of clothing. Because Officer Couffer thought the driver might be reaching inside his jacket for a weapon, he was focused on the suspect.

The same indicia of reliability attach to Ms. Couffer's identification. She was focused on the situation. The scene was illuminated. She was close enough to the suspect to observe a "smirky smile" on his face. R. Vol. 2 at 111. The confrontation lasted up to sixty seconds. She also testified that she saw the driver's face "very plain and very clear." *Id*. at 127.

Mr. Maxwell has pointed out inconsistencies in the Couffers' testimony. He also argues that this high-stress situation occurred in the dark of night. However, the inconsistencies have little, if anything, to do with the identification issue. More to the point, both witnesses testified that despite the stress of the situation and the lighting, they had the ability and time to observe the driver of the motorcycle. They testified unequivocally that the driver was Mr. Maxwell.

The district court's factual findings are not clearly erroneous. It properly considered the *Biggers* factors in testing reliability. As such, the court did not err in denying Mr. Maxwell's motion to exclude the Couffers' in-court identifications.

C. *Predicate Offenses for the ACCA*

Relying on three predicate convictions, the government sought an enhanced penalty under the ACCA. *See* 18 U.S.C. § 924(e)(1) ("In the case of a person who violates section 922(g) of this title and has three previous convictions by any

- 13 -

court . . . for a violent felony . . . such person shall be . . . imprisoned not less than fifteen years . . . .").  Mr. Maxwell objected, on two grounds, to the classification of his 1981 Oklahoma state conviction for assault with a dangerous weapon as a violent felony.  The district court overruled the objection.  "We review de novo the legal question of whether prior convictions qualify as violent felonies under the ACCA." *United States v. Hernandez*, 568 F.3d 827, 828 (10th Cir. 2009).

Mr. Maxwell argues in his opening brief that when he pleaded guilty in 1981, his lawyer failed to inform him that the conviction could be used as a sentence enhancer in a future criminal proceeding.[1]  But "[a] defendant may not collaterally attack a previous state conviction used to enhance his sentence under the ACCA outside habeas proceedings except in the limited circumstances where his right to appointment of counsel has been violated." *United States v. Smith*, 652 F.3d 1244, 1246 n.3 (10th Cir. 2011); *see also Custis v. United States*, 511 U.S. 485, 496-97 (1994) (holding that a defendant may not use a federal sentencing proceeding to

---

[1]We find this argument confusing because the presentence report indicates that Mr. Maxwell was convicted by a jury of the offense.  If Mr. Maxwell intended to refer to his 1985 conviction, which was the result of a guilty plea, we reject his argument for two reasons.  First, the 1985 conviction was the result of a guilty plea in which Mr. Maxwell was represented by counsel, and thus was not obtained in violation of his right to counsel.  *See United States v. Smith*, 652 F.3d 1244, 1246 n.3 (10th Cir. 2011); *see also Custis v. United States*, 511 U.S. 485, 496-97 (1994).  Second, Mr. Maxwell waived any objection to the use of the 1985 conviction because, in objecting to the amended presentence report, he stated:  "Mr. Maxwell is raising an objection only to the 1981 offense."  R. Vol. 1 at 110.

attack the validity of a prior state conviction used to enhance his federal sentence unless the conviction was obtained in violation of the right to counsel).

Mr. Maxwell also argues that the 1981 conviction does not meet the definition of a felony under Oklahoma law.[2] We disagree.

Mr. Maxwell argues that because he received only a six month sentence in county jail, his conviction was not a felony under Oklahoma law. In particular, he cites Okla. Stat. tit. 21 § 5, which provides that a "felony is a crime which is, or may be, punishable with death, or by imprisonment in the penitentiary," and Okla. Stat. tit. 21 § 645, which in 1981 provided that the type of assault **of** which Mr. Maxwell was convicted, was "a felony punishable by imprisonment in the penitentiary not exceeding five (5) years, or by imprisonment in a county jail not exceeding one (1) year."

Oklahoma law holds that it is the potential punishment—not the actual punishment—that is used to determine whether a conviction is a felony. *See Braly v. Wingard*, 326 P.2d 775, 776 (Okla. 1958) (per curiam) ("It is not the actual

---

[2]Mr. Maxwell acknowledges that § 924(e)(2)(B) defines a violent felony as: "[A]ny crime punishable by imprisonment for a term exceeding one year." He never explains, however, why the 1981 conviction does not meet the definition of a violent felony under federal law. As the government points out, § 924(e)(2)(B) says "punishable by" not "punished by." The conviction meets the definition of a felony under the federal statute.

- 15 -

punishment imposed but the extent to which punishment may be imposed which controls the point whether the crime is a felony[.]").

In determining the maximum punishment provided for by Oklahoma law, we inquire as to the maximum punishment as of the date of Mr. Maxwell's predicate conviction. He was arrested on December 23, 1981, and sentenced on February 16, 1982. Even though the record does not reflect the exact date of conviction for that crime, the law was constant between the date of arrest and date of sentencing, and during that entire time frame provided for a maximum punishment of five years of imprisonment in the penitentiary. Okla. Stat. tit. 21 § 645 (1981); *see also* Okla. Stat. tit. 21 § 645 (1982) (reflecting a change in the assault statute that increased the maximum punishment to ten years of imprisonment in the penitentiary effective April 16, 1982). Thus, Mr. Maxwell was convicted of a crime that was punishable by up to five years of imprisonment at the time of that conviction, which was therefore a felony under Oklahoma law.

D. *Sufficiency of the Evidence*

Mr. Maxwell's final argument is that the evidence was not sufficient to support the jury's verdict on either count. We disagree.

To sustain a conviction for felon in possession of a firearm and ammunition under § 922(g)(1), the government needs to prove beyond a reasonable doubt that: (1) Mr. Maxwell had been previously convicted of a felony; (2) he thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate

commerce. Mr. Maxwell stipulated to the first and third elements. He argues that there was not sufficient evidence to prove the second element of the crime, i.e., that he knowingly possessed a firearm.

"The sufficiency of the evidence to support a jury's verdict is reviewed de novo. On appeal, we ask only whether taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Keck*, 643 F.3d 789, 793 (10th Cir. 2011) (citation and internal quotation marks omitted).

"The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt." *Id*. But "[i]n conducting this review, we may neither weigh conflicting evidence nor consider the credibility of witnesses." *Id*. (internal quotation marks omitted). "It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented." *Id*.

As to the motorcycle incident, Mr. Maxwell reprises his arguments that the Couffers' in-court identification was so tainted by the photographs that their testimony was not credible. He also argues that their opportunity to observe the driver was poor because it was dark and they were under stress. It was for the jury to weigh their testimony. And there was other evidence that did more than raise a suspicion of guilt. The motorcycle was titled in Mr. Maxwell's name, and the cell phone, envelope, and address book found in the saddlebags pointed to Mr. Maxwell.

- 17 -

The linchpin of Mr. Maxwell's argument as to whether he was in possession of the rifle that was found near the vehicle in which he was a passenger, is that neither Mary Jo Cravatt nor Dylan Perry saw Mr. Maxwell carrying a rifle when they picked him up at the motel. But the government pointed out Ms. Cravatt's potential bias and that Mr. Perry wasn't paying any particular attention to what the Maxwells had in their possession. In addition, Judy Moore's neighbor testified that, although the appearance of the rifle had been altered, the serial number of the weapon recovered at the scene matched the serial number of the rifle that Mr. Maxwell took from Ms. Moore's home. This evidence, coupled with Mr. Maxwell's comments to his wife recorded shortly after his arrest, was more than sufficient for the jury to convict him.

The judgment of the district court is AFFIRMED.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge